TOLMAN et al. v. UBERO PLANTATION CO.

(Circuit Court, D. Massachusetts. December 22, 1905.)

No. 2,092.

CORPORATIONS—RECEIVERSHIP—RESTORATION OF PROPERTY AT REQUEST OF MA-
JORITY OF STOCKHOLDERS.

At the suit of stockholders, and with the consent of the corporation,
receivers were appointed for its property, but no order was made for
winding up its affairs. It was shown that it was organized and its af-
fairs conducted by its promoters for the purpose of defrauding subsequent
purchasers of stock, and that of the amount received from the sale of
stock only a small proportion had been honestly expended for their bene-
fit, but the corporation was solvent and had some tangible property and
money on hand. A part of the stockholders desired to reorganize the
corporation and continue the enterprise for which it was organized, while
others favored its being wound up, and, on the matter being submitted to
a vote, a large majority of those voting favored reorganization. *Held*
that, in view of such vote, the receivers would be discharged and the
property restored to the stockholders.

In Equity.

C. P. Sampson, for Ubero Plantation Co.
Fred C. Chamberlin, for certain stockholders.
Henry E. Warner, for reorganization committee.

LOWELL, Circuit Judge. The plaintiffs, stockholders in the de-
fendant company, brought a bill alleging: Fraud in the corporate
management by sundry officers of the corporation; dissensions among
the stockholders; that suits were threatened, and that rights which the
defendant corporation had against others were in danger of being lost
by the fraud of the corporation's officers above referred to; that the
company's property was in danger of loss; that the stockholders' in-
terests could be saved only by the appointment of a receiver to care for
the corporate property and to bring the necessary suits.

Upon preliminary proof, and with the defendant's consent, the
court appointed receivers of all the defendant's property, choses in
action, franchises, and rights, but the decree contained no provision
for winding up the defendant's affairs. From this omission, the fault
of the court as well as of counsel, the controversy now pending has
arisen.

The receivers took charge of the property, and made investigation
concerning the corporate affairs. In their report they state that the
corporation was organized by Owen, Borges and Clark, under the
laws of Maine in 1900, with an authorized capital of $1,000,050, con-
sisting of 6,667 shares of the par value of $150 each; that, before any
money was paid in, Borges was appointed business manager and, on
behalf of the defendant, executed a contract with the La Puerta Plan-
tation Company, hereinafter called the "Plantation Company." By
this contract, the plantation company contracted with the defendant
to develop and plant with coffee, pineapples, and rubber 3,000 acres
of forest land in the state of Oaxaca, Mexico. The land was conveyed

by the plantation company to a trust company. It had been bought by Owen, president of the plantation company, for about $2 an acre, and this the receivers find to have been a high price. The defendant agreed to pay the plantation company $750,000. The latter was controlled by Owen; it had no assets except the land above mentioned and its development contracts. It never did any other business, and was wholly irresponsible. The plantation company agreed with the La Puerta Development Company, another corporation, apparently controlled by Owen, to clear, plant, and develop the plantation. For this, and for a guaranty that the products of the plantation would pay dividends, the plantation company was to pay the development company $300,000, leaving $450,000 for the former to pay for land worth $10,000 or less. Comment on these transactions is unnecessary. The object of the promoters was plainly to defraud prospective stockholders of the defendant, by inducing them to put their money into an enterprise of little or no value. Further evidence of the fraud exists, but is superfluous.

In seeking to float the defendant company, the original promoters enlisted the aid of Messrs. Stedman and Hood. Both were made directors; the former becoming president, the latter vice president. They put no money into the concern, and 67 shares were allotted to each. Each received $10,000 par value of stock in the La Puerta Development Company. This they returned to the Ubero Company at a later day. Salaries were voted to Stedman, Borges, Hood, and Owen. Borges and Owen managed the business. Though Hood was voted a salary for his services upon the executive board of the company, and his name was advertised as chairman of this board, yet, so far as the defendant's record shows, there never was any such board, and the advertisements were gotten up without consulting Hood, in order to induce the public to believe that he was taking an active part in the management. It has not been contended that Stedman and Hood knew the fraud practiced by the promoters upon the stockholders, but they must have known the contracts with the plantation company, and Hood should have known that he was taking pay for his services in a corporate office which did not exist.

The enterprise was brought to the attention of the public in the usual manner, and many persons were induced to subscribe for stock; the price, for the most part, being payable by installments. Dividends were paid out of capital for three years. Pineapples and coffee were planted, but without result. Rubber trees also were planted, which are not sufficiently grown to yield returns.

After three or four years, Stedman and Hood, and perhaps others interested, suspected that matters were not going well. Payments to the two La Puerta companies were stopped, stockholders' committees were appointed, and the receivership proceedings were begun. Stedman and Hood are persons of substance, living here; most of the other promoters are inaccessible.

There came into the hands of the receivers the land in question; about 700 acres being planted in rubber. A few thousand dollars in

cash were found at the company's office in Boston. The defendant's debts were very small, and may be neglected. Owen, Borges, and the original promoters have been deprived of control, and the fraudulent promotion has ceased.

Two parties have developed among the stockholders. One desires to reorganize the defendant corporation. Its members are ready to pay in considerable sums of money. Messrs. Stedman and Hood will make considerable payments in aid, and more than $40,000 is thus made available for continuing the defendant's business as a grower of rubber. They therefore ask that the receivers be ordered to turn the corporate property back to the defendant. Other stockholders believe that the enterprise, an admitted fraud in its conception, can never be made to pay. They wish to sue Messrs. Stedman and Hood upon the ground that, while these two persons had no actual knowledge of the fraud of the original promoters, yet they have rendered themselves liable for some or all of its consequences by their conduct as directors. They believe that a considerable sum of money can thus be obtained for division among the stockholders, and they ask that the receivers bring this suit and wind up the defendant. Both parties doubtless would agree to sue the original promoters, were it not that a judgment against them, even if obtained, would result in little or no pecuniary return. If the first plan is adopted and the money of Messrs. Stedman and Hood is received for the purpose of reorganization, no suit is likely to be brought against them.

The receivers incline to think the second course is desirable, and my opinion decidedly agrees with theirs. While I have no right to speak as an expert, I have little doubt that the reorganization is but the throwing of good money after bad. About $75,000 has been actually spent on the plantation, and it has been spent wastefully. A wasteful expenditure of this sum will not ordinarily pay returns on a capital of more than $500,000. Of the prospects of a suit against Messrs. Stedman and Hood, I cannot properly speak, but the suit can be pressed without an assessment, as there are sufficient funds in the hands of the receivers to pay costs and counsel. fees. The defendant, however, is practically free from debt. The decree appointing the receivers did not provide, as it should have done, for winding up the corporate business. I have therefore deemed it right to submit the question of policy to the judgment of the stockholders, that the court might be advised by their opinion, though not necessarily bound by it. A circular was sent out to all stockholders, stating the two plans, accompanied by circulars drawn up by the two parties, and asking a vote upon the termination of the receivership. The result of the vote shows that there are in all about 935 stockholders, having an actual investment of $554,000. Four hundred and thirty-eight of these replied to the circular; 256, representing an investment of about $246,000, voted "Yes"; 174, representing an investment of about $85,000, voted "No." The vote of eight was doubtful and could not be canvassed. Under these circumstances, having satisfied myself that there is a tangible plantation at the place stated, I have deemed it wise to accede to the wishes of the large majority

of those stockholders who have seen fit to vote. The receivers will be paid their charges and a proper compensation, and will be discharged. The property will be handed back to the stockholders. It it to be hoped that the plan of reorganization will result in a substantial return to the investors. If it does not, they will understand that they cannot again invoke the aid of a court of equity.